IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CHRISTOPHER SCOTT, #R31806, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-671-RJD |
| | ) | |
| STEPHEN RITZ and MOHAMMED SIDDIQUI, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

**DALY, Magistrate Judge:**

This matter comes before the Court on Defendants' Motion for Summary Judgment (Docs. 88 and 89). Plaintiff filed a Response (Doc. 91). As explained further, Defendants' Motion is GRANTED.

## INTRODUCTION

Plaintiff, an inmate within the Illinois Department of Corrections, filed this lawsuit pursuant to 42 USC §1983. He alleged that from June 2016-January 2019, healthcare providers at Menard Correctional Center were deliberately indifferent to his recurring chest pain, irregular heartbeat, swollen hands and feet, and fainting episodes. Defendants filed Motions for Summary Judgment regarding Plaintiff's exhaustion of administrative remedies (Docs. 41 and 61).[1] After the Court ruled on those motions, Plaintiff's allegations of deliberate indifference were limited to the treatment and care provided (or not provided) to Plaintiff by Defendants Siddiqui and Ritz

---

[1] Prisoners are required to exhaust available administrative remedies prior to filing lawsuits in federal court. 42 U.S.C. § 1997e(a).

from August 2, 2017 to January 2019 (Doc. 65).

## UNDISPUTED MATERIAL FACTS

The Court construes the following facts in the light most favorable to Plaintiff, the non-movant.  Plaintiff was incarcerated at Menard Correctional Center ("Menard") for approximately fifteen years before he transferred to Western Illinois Correctional Center in March 2019.  Doc. 89-1, p. 6.  Defendants Ritz and Siddiqui were employed by Wexford Health Sources, Inc., a company that contracts with the Illinois Department of Corrections ("IDOC") to provide healthcare to inmates.  Doc. 89-2, p. 1.  Dr. Siddiqui treated inmates, including Plaintiff, at Menard.  *Id*.  Dr. Ritz "served as Corporate Utilization Management Medical Director" for Wexford and "provided collegial review services for inmates within the Illinois Department of Corrections."  Doc. 89-3, ¶¶4, 5.

In May-July 2017, Plaintiff saw various staff members in the healthcare unit at Menard regarding his complaints of sharp pain in his chest and irregular heartbeats.  Doc. 89-5, p. 91, 93, 102; Doc. 91, p. 62, 78, 86.  He was advised to eat slowly and take Pepcid AC.  Doc. 89-5, p. 93. Dr. Siddiqui advised him to go to First Aid when he experienced left chest pain.  Doc. 89-2, ¶4; Doc. 91, p. 62.  He underwent an electrocardiogram ("ECG"); health care staff reported that the results were "normal" and "usual outcome."  Doc. 89-5, p. 91, 102; *see also* Doc. 91, p. 79. Plaintiff had previously been diagnosed with hyperlipidemia and was taking medication for it.[2] Doc. 91, p. 78, 103.

On August 2, 2017, Plaintiff reported to a nurse that he had "sharp pain in my chest when

---

[2] "Hyperlipidemia, also known as dyslipidemia or high cholesterol, means you have too many lipids (fats) in your blood."  myclevelandclinic.org/health/diseases/21656-hyperlipidemia (last accessed Mar. 23, 2023).

I take a deep breath." Doc. 89-5, p. 104. Dr. Siddiqui saw Plaintiff and referred him for emergency care at Memorial Hospital in Chester, Illinois. Doc. 89-2, ¶5; Doc. 89-8, p. 4. Plaintiff underwent an electrocardiogram ("ECG"), chest x-ray, a CT angiogram of the chest, and various laboratory tests. Doc. 89-8, p. 6-9. Plaintiff's ECG was normal and his chest x-ray images were "unremarkable." *Id*., p. 8. Some of Plaintiff's laboratory results were abnormal, including his d-dimer[3] level, which was elevated. *Id*. The CT angiogram showed "no pulmonary embolus. Mild bibasial dependent atelectasis."[4] The ER doctor noted that Plaintiff had a history of high cholesterol. *Id*., p. 5.

The ER physician noted that Plaintiff's "pain resolved promptly with administration of one dose of…GI cocktail, suggesting the diagnosis of gastroesophageal reflux disease." *Id*., p. 9. In the "Additional Instructions" portion of the ER notes, Plaintiff was informed that "it appears that you have gastroesophageal reflux disease and you have been given a prescription for Prilosec, which suppresses gastric acid secretion…[y]our doctors at the Menard Correctional Center may also want to obtain a cardiac stress test to more conclusively exclude the diagnosis of coronary artery disease." *Id*., p. 10.

Plaintiff returned to Menard later that day and a nurse notified Dr. Siddiqui, who prescribed Prilosec to treat Plaintiff's heartburn and gastroesophageal reflux disease ("GERD"). Doc. 89-5, p. 106; Doc. 89-2, ¶7. Two days later (August 4, 2017), Dr. Siddiqui submitted a referral request to Dr. Ritz for Plaintiff to undergo a cardiac evaluation. Doc. 89-2, ¶8; Doc. 89-4, p. 43. On

---

[3] "A d-dimer test is a simple blood test that can help your healthcare provider determine if you may have a blood clotting condition." my.clevelandclinic.org>health>diagnostics (last accessed Mar. 15, 2023).
[4] "A pulmonary embolism is a blood clot that blocks and stops flow to an artery in the lung." mayoclinic.org> diseases-conditions>pulmonary (last accessed Mar. 15, 2023).

August 8, 2017, Plaintiff reported to a nurse at 5:30 a.m. that he had chest pain and tingling in his left arm. Doc. 89-5, p. 108. Dr. Siddiqui ordered that Plaintiff be placed in 23-hour observation. *Id.*, p. 108. Dr. Siddiqui examined Plaintiff at 7:30 a.m. and reviewed the records of Plaintiff's August 2, 2017 visit to the emergency room. Doc. 89-2, ¶9; Doc. 89-5, p. 111. Dr. Siddiqui's physical exam of Plaintiff was normal. Doc. 89-2, ¶9. Dr. Siddiqui and Dr. Ritz conferred and decided upon a treadmill stress test as Plaintiff's next diagnostic step. Doc. 89-2, ¶10. Dr. Ritz did not think a "full cardiac evaluation was…medically indicated." Doc. 89-3, ¶7. On August 9, 2017, Dr. Siddiqui ordered Plaintiff a 30-day supply of Metoprolol.[5]

There is a typed note in Plaintiff's medical records dated 9/7/17 at 11:20 a.m. and titled "Med Furlough Clerk Note." Doc. 89-5, p. 123. It states, "Admit to infirmary. NPO[6] after 6:00 a.m. No beta blockers morning of test (9/8/17)." *Id*. Plaintiff underwent a stress test at Sparta Community Hospital on September 8, 2017. Doc. 89-9, p. 7. Plaintiff testified that he took his daily medications prior to the stress test, and healthcare staff gave him "another nitroglycerin" before he was transported to Sparta Community Hospital. Doc. 89-1, p. 11. The physician and staff at Sparta Community Hospital told Plaintiff the results of the test would be compromised because Plaintiff had taken a beta blocker, "but they would proceed anyway, just to see what would transpire." *Id*. The physician told Plaintiff that "they [had] advised Siddiqui to ensure that [Plaintiff] did not take any beta blockers" the day before the stress test. *Id*. Plaintiff performed the treadmill stress test. *Id.*, p. 12. Plaintiff was on the treadmill "going up and down for 14

---

[5] "Metoprolol is used alone or together with other medicines to treat high blood pressure (hypertension)… [m]etoprolol is also used to treat severe chest pain (angina)…[t]his medicine is a beta-blocker." mayoclinic.org/drugs-supplements/metoprolol-oral-route (last accessed Mar, 23,2023).
[6] NPO means "nothing by mouth." merriam-webster.com/medical/NPO (last accessed Mar. 20, 2023).

minutes" and he recalls that "eventually, I'd stop because I was tired. So I remember then I started having chest pains during that time." *Id*.

Dr. Regina Chiu sent Dr. Siddiqui the following handwritten note:

> Mr. Christopher Scott DOB 6/21/80 was able to exercise 10 min 3 sec…no chest pain during exercise but had 6/10 chest pain during recovery. No ECG changes were seen. He has sharp pains- consider a trial of NSAIDs. Ibuprofen 600 mg by mouth every eight hours for three days with food. The official report is being typed and sent. Please do not hesitate to contact us with questions.

Doc. 89-9, p. 10. When Plaintiff returned to Menard, Dr. Vipin Shah ordered the Ibuprofen, 600 milligrams. Doc. 91, p. 75.

In her official report, Dr. Chiu noted that Plaintiff had a history of high cholesterol and a "strong family history of coronary artery disease." *Id*., p. 7. Because Plaintiff had taken a "beta blocker before [the test]...his heart rate was blunted." *Id*. Dr. Chiu noted her impression that Plaintiff "demonstrated excellent functional aerobic capacity." *Id*. He "had fatigue cramping in his gluteals and 6/10 chest pain during recovery." *Id*. His stress ECG "was negative for ischemic changes" and "no arrhythmias were noted." *Id*.

On September 22, 2017, Plaintiff "fainted in the workplace" after experiencing severe chest pain. Doc. 91, p. 15.[7] According to a record in his chart, a nurse was called to Plaintiff for his complaints of chest pain. Doc. 89-5, p. 129. Plaintiff testified at his deposition that during this time frame, he experienced episodes of dizziness. Doc. 89-1, p. 20.

Plaintiff saw Dr. Siddiqui on October 2, 2017. Doc. 89-2, ¶14; Doc. 89-6, p. 145. Dr.

---

[7] Plaintiff states this information in his Response to Defendants' Motion for Summary Judgment, which is accompanied by a sworn declaration. Doc. 91, p. 34.

Siddiqui reviewed Plaintiff's ER and stress tests records and noted "all tests are normal." *Id*. Dr. Siddiqui advised Plaintiff to stop taking ibuprofen but to take Tylenol for pain. *Id*.

Plaintiff saw Dr. Siddiqui twice in November 2017. On November 8, Dr. Siddiqui noted "his symptoms are most likely anxiety and advised to discuss with mental health he demands additional test….advised and reassured that his stress test is normal…refer to mental health for anxiety." Doc. 89-6, p. 148. On November 16, a medical technician ("CMT") noted that Plaintiff said, "I have a mild bibasal dependent atelectasis which is a serious matter involving my lungs." *Id*., p. 154. The medical technician also wrote "[t]his CMT attempted education with inmate, involving his above diagnosis. Inmate requests a provider explain this issue to him…[r]efer to MD for education and reassurance." *Id*. Dr. Siddiqui saw Plaintiff on November 21 and noted that Plaintiff "continues to have anxiety from reading all the computer print outs given to him by the cardiologist. Have reassured that stress test is negative. He is anxious about mild atelectasis reported on CT chest (mild basal atelectasis) Ex-smoker. Lungs clear...has not seen by mental health for anxiety." *Id*., p. 155. Dr. Siddiqui ordered another chest x-ray. *Id*. The images were normal. Doc. 89-5, p. 184. There is also a note in Plaintiff's records from a nurse practitioner on November 24, 2017 that states "Scheduled for explanation of atelectasis. Explained atelectasis….…Normal exam." Doc. 89-6, p. 156.

On February 4, 2018, Plaintiff sent the following written request to the healthcare unit:

> My left hand [has] been swelling up including my 5-fingertips and [has] spread[] to my forearm. It happens every morning and swells back up at night for the last 1 ½ weeks. I need to see medical personnel to know why I have this issue and make sure [I'm] not about to have a stroke or heart attack.

Doc. 89-6, p. 91. Entries by healthcare staff reflect that Plaintiff's hands were examined on February 10 and 13, 2018; no swelling was noted on either occasion. Doc. 89-6, p. 167-168. Plaintiff then saw Dr. Siddiqui on March 2, 2018; Dr. Siddiqui's note states "no swelling…has recent blood work CBC/CMP negative." *Id*., p. 174. Dr. Siddiqui ordered x-rays of Plaintiff's hands; the images were unremarkable. Doc. 89-5, p. 186. A nurse practitioner saw Plaintiff on March 26, 2019 for his complaints of swelling in fingertips and in toes. Doc. 89-6, p. 177. The nurse practitioner noted that Plaintiff had a "normal exam...follow/up as needed." *Id*.

On April 27, 2018, Dr. Siddiqui saw Plaintiff and noted "multiple complaints…demanding cardiology referral…has had previous investigations stress/ECG/blood tests…chronic recurrent non specific chest pain…no SOB….family history of heart disease and wants coronary angio." *Id*., p. 183. Dr. Siddiqui referred Plaintiff to another physician for a second opinion. Doc. 89-2, ¶18.

Plaintiff saw Dr. Caldwell on July 29, 2018. *Id*., ¶19. Dr. Caldwell wrote "[p]rior to last stress test patient took his meds. This had an affect on his stress. Patient still complains of chest pain and changes in heart rate…test needs repeating, with strict limits." Doc. 89-7, p. 9. Dr. Caldwell submitted a referral to Dr. Ritz in collegial review for Plaintiff to have another stress test; Dr. Ritz did not think a "repeat stress test was...medically indicated" and thought that instead, Plaintiff should be monitored onsite. Doc. 89-3, ¶¶8.

Dr. Siddiqui saw Plaintiff on August 19, 2018. Doc. 89-2, ¶20. There were no changes in his symptoms of chest pain. *Id*. Dr. Siddiqui believed that because Plaintiff's previous tests were negative, "it was not medically indicated for additional cardiac related testing." *Id*.

Plaintiff transferred from Menard to Western Illinois Correctional Center in March 2019. He had an ECG on June 4, 2019. Doc. 89-7, p. 46. He saw a nurse practitioner for a physical exam on June 13, 2019. Doc. 89-5, p. 170. The nurse practitioner noted that he had a "normal physical exam…hyperlipidemia…hypertension…heartburn…continue meds as ordered. Follow up in two years for next physical exam…follow up in chronic clinics as scheduled." *Id*.

Between March 2019 and March 2022, Plaintiff did not receive a "diagnosis from a physician, or a cardiologist…that [he] ha[d] some kind of cardiology….issue." Doc. 89-1, p. 22. As of March 4, 2022 (the date of his deposition), Plaintiff still has similar symptoms that he experienced at Menard (chest pain, tingling in hands and feet) and testified that cardiac testing is "ongoing…I don't know why it's taking this long" but he has not "received diagnosis yet." *Id*. At times, Plaintiff can "feel [his] heart beating—pumping differently." *Id*.

Plaintiff never saw Dr. Ritz in person. Doc. 89-1, p. 5. He did not know Dr. Ritz was involved in his care until he viewed his own medical records and saw that Dr. Ritz's approval was sought for certain treatments. *Id*.

**Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is

made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

## Discussion

Plaintiff alleges that Dr. Ritz and Dr. Siddiqui violated his Eighth Amendment right to be free from cruel and unusual punishment. The Supreme Court recognizes that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail in his claims against Defendants, Plaintiff must establish first that his symptoms were "objectively, sufficiently serious" and second, that Defendants "acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted). A medical condition is objectively serious if, *inter alia*, it causes "chronic and substantial pain," or if it "significantly affects an individual's daily activities." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008). Defendants explain that they "question" whether Plaintiff has a serious medical need, but for purposes of summary judgment only argue that no factfinder could conclude Defendants acted with a sufficiently culpable state of mind.

Plaintiff contends that Defendants violated his Eighth Amendment rights by failing to 1)

follow recommended treatments; 2) provide any additional testing after 9/8/2017; and 3) provide additional medical treatment knowing Plaintiff continued to complain of chest pains, "other symptoms of high blood pressure," fainting episodes, irregular heart beats, and shortness of breath. Doc. 91, p. 5.   The record before the Court contains no evidence that suggests either Dr. Ritz or Dr. Siddiqui did not "follow recommended treatment" for Plaintiff's reported symptoms.   The ER doctor at Chester Memorial Hospital recommended Prilosec, which Dr. Siddiqui ordered.   Dr. Chiu recommended Ibuprofen; Dr. Vipin Shah ordered the Ibuprofen, so there was no need for Dr. Siddiqui to do so.

The Court acknowledges that the evidence indicates that Plaintiff took a beta blocker on the morning of his stress test, which was not recommended.   However, no evidence suggests that Dr. Ritz or Dr. Siddiqui was responsible for the beta blocker administration, either by directing Plaintiff to take it or by directing the healthcare staff to give it to him despite Dr. Chiu's instructions.   Certainly, neither physician was present when Plaintiff took the beta blocker.   A medical furlough clerk noted that Plaintiff was not supposed to take his beta blocker prior to the test, so at most, the factfinder could reasonably infer that either miscommunication or inadvertence resulted in Plaintiff taking the beta blocker.

Similarly, the record does not reflect that Defendants acted with deliberate indifference by failing to provide any additional testing for Plaintiff after September 8, 2017 (the date of the stress test).   A physician who makes a "decision based on medical judgment" is not deliberately indifferent, even if another physician may have acted differently.  *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 241 (7th Cir. 2021).   Plaintiff testified at his deposition that post

September 8, 2017, his previously reported symptoms (rapid heartbeat, chest pain, dizziness) became worse.  However, Plaintiff appeared in the healthcare unit multiple times from May-August 2017 to seek treatment for these symptoms, reporting that his pain was 10 on a scale of 1-10. See, e.g., Doc. 91, p. 78, 90.  During that time period he received multiple diagnostic tests: chest x-ray (images were unremarkable), two ECGs (both normal) and a stress test (revealing that he had "excellent functional aerobic capacity" and no ischemic changes or arrhythmias).  The results of his bloodwork at Chester Memorial Hospital revealed some out-of-range results, and the CT angiogram revealed "mild bibasilar atelectasis."  The Court is not able to interpret those results, but the ER physician noted them in his report and still reached the conclusion that Plaintiff had GERD and that Plaintiff's doctors "might…want to" order a stress test, which was performed on September 8.  Accordingly, all reasonable inferences from the evidence suggest that Dr. Ritz and Dr. Siddiqui did not order additional testing after September 8 because Plaintiff's previous tests were normal, which is a decision based on medical judgment.

The only *new* symptom Plaintiff reported after September 8, 2017 was swelling in his hands.  Multiple providers examined Plaintiff and noted no swelling.  However, to address Plaintiff's complaints Dr. Siddiqui ordered x-rays of Plaintiff's hands, which were normal.

According to Dr. Caldwell's note, he recommended that Plaintiff undergo an additional stress test because Plaintiff took a beta blocker on the morning of the first stress test.  Dr. Ritz and Dr. Siddiqui disagreed.  Disagreement between doctors is not sufficient to establish deliberate indifference.  *Zaya v. Sood*, 836 F. 3d 800, 803 (7th Cir. 2016).  Plaintiff must point to some evidence that Defendants, in their decision not to order an additional stress test for Plaintiff as

recommended by Dr. Caldwell, disregarded a substantial risk of harm to Plaintiff.  *Id*.  Dr. Chiu (who performed the stress test) knew that Plaintiff had taken a beta blocker, performed the test anyway, and merely recommended that Plaintiff take ibuprofen for pain after interpreting the results of the test.  The evidence therefore reflects that Dr. Ritz and Dr. Siddiqui did not disregard a substantial risk of harm to Plaintiff when they did not order another stress test based on Dr. Caldwell's recommendation.

Plaintiff argues that the only way he could prove his case was to depose Dr. Chiu, and thus the Court erred in denying his motions for recruitment of counsel (Docs. 66, 69, 83).  Having viewed all evidence in the light most favorable to Plaintiff, the Court disagrees.  Based on Dr. Chiu's statement in her report that Plaintiff's heart rate was blunted by the beta blocker, the Court infers that Plaintiff's stress test results were, in fact, affected by the beta blocker.  Despite the effect the beta blockers had on the results, Dr. Chiu did not give any recommendations in her written report for additional testing or treatment other than ibuprofen.  Regardless of any testimony Dr. Chiu might give, Dr. Ritz's and Dr. Siddiqui's reliance on her written report (and her decision to go forward with the test knowing that Plaintiff had taken the beta blocker) was not a violation of Plaintiff's Eighth Amendment rights.

Finally, Plaintiff contends that Dr. Ritz and Dr. Siddiqui failed to provide him with any treatment to alleviate his symptoms.  Prison doctors are not required to keep inmates pain-free. *Snipes v. DeTalla*, 95 F.3d 586, 592 (7th Cir. 1996) ("it would be nice if after appropriate medical attention pain would immediately cease; but life is not so accommodating").  However, persisting in an ineffective course of treatment may constitute deliberate indifference.  *Greeno,* 414 F.3d at

655; *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ( "medical personnel cannot simply resort to an easier course of treatment that they know is ineffective"). Regardless, the record must reflect some evidence that suggests Plaintiff's unalleviated symptoms were caused by Defendants "actions or inaction" in order for Plaintiff's claims to survive summary judgment. *See Dean*, 18 F. 4th 242.

In addition to the multiple diagnostic tests performed to determine the cause of Plaintiff's symptoms, Dr. Siddiqui and other practitioners at Menard attempted to alleviate his symptoms through various medications for GERD, high cholesterol, high blood pressure, and chest pain. Viewing the evidence in the light most favorable to Plaintiff, those medications did not alleviate Plaintiff's symptoms. However, considering the multiple attempts made to discover the cause of Plaintiff's symptoms and to treat those symptoms, it is unreasonable to infer that Dr. Ritz and Dr. Siddiqui persisted in a course of ineffective treatment. Moreover, three years after leaving Menard, Plaintiff still has those same symptoms despite ongoing testing. The record therefore reflects that neither action nor inaction by Dr. Ritz or Dr. Siddiqui caused Plaintiff's prolonged pain.

In sum, the evidence viewed in the light most favorable to Plaintiff does not indicate that Defendants were deliberately indifferent to Plaintiff's complaints of chest pain, rapid heartbeat, dizziness, and tingling/swelling in his extremities. Defendants are entitled to summary judgment in their favor.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 89) is GRANTED and Plaintiff's

claims against them are DISMISSED WITH PREJUDICE. The Clerk of Court is directed to enter judgment accordingly. All pending deadlines and hearings are VACATED.

**IT IS SO ORDERED.**

**DATED: March 27, 2023**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**